UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-80033-Cr-ROSENBERG

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JAMES CINE, et al.,

Defendants.

_____/

## PLEA AGREEMENT

The United States of America (hereinafter the "United States" or "this Office" and, JAMES CINE (hereinafter "the defendant") enter into the following agreement:

1.      The defendant agrees to plead guilty to Counts 1 and 6 and 7, of the Indictment, each of which counts charge the defendant in: Count 1, with Conspiracy to Possess with Intent to Distribute 40 Grams or More of a Mixture and Substance Containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known, and hereinafter referred to, as Fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(iv), and 846; Count 6, with Distribution, and Possession with Intent to Distribute, Fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and; in Count 7, with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Sections 924(c) and 2.  The defendant further agrees to forfeit to the United States certain firearms and ammunition as described below.

2.      In return for the defendant's guilty plea to Counts 1, 6 and 7 of the Indictment, the United States agrees to move to dismiss Counts 3, 5 and 8, at time of sentencing.

3.      The defendant is aware that his sentence will be imposed by the Court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines").   The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines, which may include "relevant conduct" under Section 1B1.3 of Sentencing Guidelines, and that the applicable guidelines will be determined by the Court relying in part on the results of a Pre-Sentence Investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered.   The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines.   The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence.   Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

2

4.      The United States agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will make a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.   The United States, however, will not be required to make this motion and recommendation if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official; (4) or attempts to withdraw his plea after a finding by the Court that such was knowingly and voluntarily made.

5.      **MAXIMUM PENALTIES:**      The United States and the defendant understand and agree that the Court may impose any sentence authorized by law and that the defendant may not withdraw his plea solely as a result of the sentence imposed,

3

including the imposition of a consecutive sentence (which in this case is required by statute) with respect to Count 7 to any penalty imposed upon Counts 1 and 6:

    a.    **Count 1:**   As to Count 1 of the Indictment, the defendant understands and acknowledges that he faces he faces a mandatory minimum sentence of five (5) years' imprisonment, to a maximum penalty of forty (40) years, to be followed by a minimum four (4) year, to a maximum life term of supervised release,[1] and a fine of up five million dollars ($5,000,000).

    b.    **Count 6**:  As to Count 6 of the Indictment, the defendant understands and acknowledges that the Court may impose a maximum term of twenty (20) years' imprisonment, to be followed by a minimum three (3) year, to a maximum life term of supervised release, and a fine of up to two-hundred and fifty thousand dollars ($250,000).

    c.    **Count 7:** As to Count 7 of the Indictment, the defendant understands and acknowledges he faces a mandatory minimum sentence of five (5) years' imprisonment, consecutive (that is, in addition to, or after) any penalty imposed as to, or on, Count 6 of the Indictment, to a maximum term of life imprisonment,[2] to be followed by a maximum term of up to five (5) years' supervised release, and a fine of up to two-hundred and fifty thousand dollars ($250,000).

    d.    **<u>Total Possible Penalty:</u>**  The defendant understands and acknowledges that the total possible penalty he faces is a mandatory minimum of ten (10) years'

---

[1] *See United States v. Sanchez*, 269 F.3d 1250, 1287-88 (11th Cir. 2001)(Holding where statute does not otherwise specify a maximum sentence, maximum sentence is life)

[2] *See* footnote 1, above.

4

imprisonment, to a maximum term of life imprisonment, a four year mandatory minimum term of supervised release, to a maximum life term of supervised release, and a fine of up to $5,500,000.

e.    The defendant also understands and acknowledges that if he were not a United States citizen, that his conviction for these offenses would subject him to deportation and removal from the United States.

6.    The defendant further understands and acknowledges that, in addition to any sentence imposed under the preceding paragraph of this agreement, a special assessment in the amount of $100.00 shall be imposed on the defendant for each count of conviction, which in this case shall total $300.00. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.   Payment may be either in the form of cashier's check or money order made payable to the Clerk of Court, Southern District of Florida, or in cash.   It is the prosecuting AUSA's duty to ensure that the special assessment has been paid at the time of sentencing.   If a defendant is financially unable to pay the special assessment, the defendant should be required to present evidence to the United States and the Court as to the reasons for his failure to pay.

7.    The Office of the United States Attorney for the Southern District of Florida (hereinafter "Office"), and the defendant, reserve the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background.   Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this

Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

8.      The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

9.      **ASSET FORFEITURE**: The defendant agrees, in an individual and any other capacity, to forfeit to the United States, voluntarily and immediately, any right, title, and interest to any firearm and ammunition involved in or used in the commission of such offense, pursuant to Title 18, United States Code, Section 924(d)(1); and any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offense, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense, pursuant to Title 21, United States Code, Section 853. The directly forfeitable property, includes, but is not limited to: One

(1) Glock, Model 19 Gen 4, 9mm caliber, semi-automatic pistol, bearing Serial No. BKUW 567.

10.     The defendant further agrees that forfeiture is independent of any assessment, fine, cost, restitution, or penalty that may be imposed by the Court. The defendant knowingly and voluntarily agrees to waive all constitutional, legal, and equitable defenses to the forfeiture, including excessive fines under the Eighth Amendment to the United States Constitution. In addition, the defendant agrees to waive: any applicable time limits for administrative or judicial forfeiture proceedings, the requirements of Fed. R. Crim. P. 32.2 and 43(a), and any appeal of the forfeiture.

11.     The defendant also agrees to fully and truthfully disclose the existence, nature and location of all assets in which the defendant has or had any direct or indirect financial interest or control, and any assets involved in the offenses of conviction. The defendant agrees to take all steps requested by the United States for the recovery and forfeiture of all assets identified by the United States as subject to forfeiture. This includes, but is not limited to, the timely delivery upon request of all necessary and appropriate documentation to deliver good and marketable title, consenting to all orders of forfeiture, and not contesting or impeding in any way with any criminal, civil or administrative forfeiture proceeding concerning the forfeiture.

12.     This Plea Agreement constitutes the entire agreement and understanding

between the United States and the defendant. There are no other agreements, promises,

representations, or understandings.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 11/2/2023

By: _____
JOHN C. McMILLAN
ASSISTANT UNITED STATES ATTORNEY

Date: 11/2/23

By: _____
SCOTT SKIER, ESQ.
ATTORNEY FOR DEFENDANT

Date: 11/2/23

By: _____
JAMES CINE
DEFENDANT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-80033-Cr-ROSENBERG

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JAMES CINE, et al.,

Defendants.
_____/

## STIPULATED STATEMENT OF FACTS

### A.   Elements of Offense

By his signature below, the defendant understands and acknowledges that were

this matter to have proceeded to trial, the United States would have had to prove the

following elements beyond a reasonable doubt:

As to **Count 1**, which charges the defendant with Conspiracy to Possess with

Intent to Distribute Forty (40) Grams or More of a Mixture and Substance Containing a

detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide,

commonly known, and hereinafter referred to, as fentanyl, in violation of Title 21, United

States Code, Sections 841(a)(1), 841(b)(1)(B)(iv), and 846 that:

1.   Two or more persons in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in Count 1 of the Indictment, that is, to possess a mixture and substance containing Fentanyl knowingly and intentionally, with the intent to distribute it to another person, with or without compensation;

2.   The defendant, knowing the unlawful purpose of the plan, willfully

joined in the plan; and,

3.      The object of the unlawful plan was to possess with the intent to distribute more than forty (40) grams of a mixture and substance containing Fentanyl.

The word "willfully" means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is, with bad purpose either to disobey or disregard the law.

To "intend to distribute" is to plan to deliver possession of a controlled substance to someone else, even if nothing of value is exchanged.

As to **Count 6**, which charges the defendant with Distribution, and Possession with Intent to Distribute, Fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), that:

1.      The Defendant knowingly possessed a controlled substance, in this case, a mixture and substance containing Fentanyl; and,

2.      The Defendant intended to distribute, or actually did distribute, the foregoing controlled substance.

To "intend to distribute" is to plan to deliver possession of a controlled substance to someone else, even if nothing of value is exchanged; and

As to **Count 7**, which charges the defendant with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Sections 924(c) and 2, that:

1.      The defendant committed the drug trafficking crime alleged in Count 6 of the Indictment (that is, that the defendant knowingly and willfully possessed controlled substances, with the intent to distribute, or did distribute, such to another person, with or without compensation);

2.      The defendant knowingly possessed a firearm; and

3.      The defendant possessed the firearm in furtherance of the drug

2

trafficking crime, that is, that the firearm helped, promoted, or advanced the crime in some way.

A Defendant "aids and abets" a person if the Defendant intentionally joins with the person to commit a crime. A Defendant is criminally responsible for the acts of another person if the Defendant aids and abets the other person. A Defendant is also responsible if the Defendant willfully directs or authorizes the acts of an agent, employee, or other associate. But finding that a Defendant is criminally responsible for the acts of another person requires proof that the Defendant intentionally associated with or participated in the crime – not just proof that the Defendant was simply present at the scene of a crime or knew about it.

## B.    Statement of Facts

Had this matter proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, through admissible testimony and evidence, which the defendant agrees, by his signature below, are true and correct facts, and satisfy all the necessary elements of the offenses of conviction referenced above and in paragraph 1 of the Plea Agreement:

1.      On December 10, 2022, Palm Beach County Sheriff's Office (PBSO) deputies responded to a 911 call relating to shots fired at 578 Mango Road, West Palm Beach, Palm Beach County, Southern District of Florida. A lawful state Search Warrant was sought and obtained for the residence. During a search of the residence, PBSO deputies recovered a Glock, Model G43X, 9mm semi-automatic pistol, as well as ammunition and narcotics. PBSO identified the shooter as Draiton Telfort, a convicted felon, who is currently charged in SDFL Case No. 23-80069-Cr-ROSENBERG with Felon in Possession of a Firearm and Ammunition.

2.      Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) firearms trace records for the Glock's serial number reflected an initial purchase date of December 6, 2022,

3

from "The Gun Room, LLC," a then-federally licensed firearms dealer (FFL) located in Boca Raton, Palm Beach County, Southern District of Florida, supposedly followed by an actual transfer to the customer date (due to an intervening NICS waiting period) of December 11, 2022, by a person who identified himself using Florida state-issued identification, as Trevor Scott MARTIN, the codefendant in this case, who would testify and corroborate the information set forth below. According to the ATF trace report, the firearm recovery date was December 11, 2022, with a Time to Crime (TTC) of "0" days. Based on this information, ATF Special Agent (SA) Herbert Belga was tasked to initiate an investigation of MARTIN for possible firearms trafficking.

3.      On January 5, 2023, ATF SA Belga received copies of several ATF Firearms Transaction Records (ATF Form 4473) filled out by MARTIN from FFL, The Gun Room, LLC. The receipt of the transactions for the multiple firearms purchased by defendant MARTIN lists a date of December 6, 2022. SA Belga reviewed ATF Form 4473 from The Gun Room, LLC. The ATF Form 4473 form was completed and signed by MARTIN on December 6, 2022, in the Southern District of Florida. MARTIN listed his residential address and a phone number of 561-459-9923.

4.      In view of the foregoing evidence suggesting MARTIN was engaged in the ongoing and active unlawful trafficking of firearms, ATF asked a Cooperating Defendant (CD) whether he had any knowledge of MARTIN, since both defendant MARTIN and the CD were involved in the rental of exotic vehicles in the South Florida area. On January 12, 2023, the CD informed TFO Silva that he was familiar with the company defendant MARTIN owned and then viewed the Instagram account for "Eleven Exotic Cars," in which MARTIN was advertising a firearm for sale. Further conversation between the CD and MARTIN led

4

to establishing a meeting date of January 18, 2023, at the CD's business location in Miami, Southern District of Florida.

5.      On January 18, 2023, at approximately 2:39 pm, in an audio and video recording meeting, MARTIN arrived at the CD's business, located in Miami, Miami-Dade County, Southern District of Florida, as the sole occupant of his blue Dodge Ram truck at which time MARTIN sold the CD a firearm. Once the firearm transaction concluded, the CD asked defendant MARTIN, "do you have any dope?" MARTIN responded that he did, and exited the business accompanied by the CD, and removed a second backpack with brown straps from his vehicle. They both returned to the CD's business and MARTIN said, "Please, please be careful with this" to the CD, referring to the fentanyl that was stored in the second bag. MARTIN sat at the CD's desk and removed a plastic bag containing a gray powdery substance from the bag.  MARTIN looked in the desk's area and asked for an item to prep the fentanyl and was given a can of tomato paste by the CD. Once the fentanyl was ready for sale, the CD purchased 1.767 net grams of fentanyl (based on DEA Southeast Regional Laboratory (SERL) analysis) in return for $500.00 derived from ATF Investigative Funds.

6.      The CD inquired about future transactions and asked MARTIN, "You can get more of this if I need it?" MARTIN replied, "I can get it. I could get it."  During the meeting, MARTIN provided the CD his phone number and departed the business in his blue Dodge Ram truck.

7.      On January 20, 2023, at approximately 5:11 pm, the ATF CD sent MARTIN a text message for the purpose of ordering additional firearms and fentanyl. The text messages were as follows:

CD: Yo.... Glock 19 X and a dope AK those the 2 I'm looking for. I had to run up to Orlando

to handle some stuff, I should be back Wed night. That other stuff my ppl said was pretty good too, prob gonna grab more when I get back too.

MARTIN: I can grab a Glock 19 X for you whenever. like i can go pick that up right now. do you want a sight on it or just the glock and a holster?

CD: Just the unit I don't need sight... I'll let u know when I'm driving back south.

MARTIN: alright do you want the black or brown one. the other stuff will hit harder i had already chopped it. i won't next time. that's why i said be real careful. i don't even like giving it to people that i don't know how much they do and shit like that.

8.      At approximately 1:51 pm, on January 21, 2023, the CD made a recorded

Facetime call to MARTIN, using MARTIN's phone number (561-459-9923).  During that

conversation, the following exchange took place:

CD: Yo.

MARTIN: Alright, this only comes up every once in a while, I got blue fenny straight from Mexico. My plugs got it, it's about three times stronger than what I gave you last time. Uh, without like, without cut, and I can get for the same price, like five hundred, eight. So, it'll be gone before you get back, but if you want to Zelle me, me grab it for you I can go drop it off like stash it at your spot.

CD: okay, yeah, I don't know if I want to do Zelle, maybe I can get somebody to grab some cash or something.  Let me let me see if I can make a few calls and I'll give you a shout back yeah.

MARTIN: yeah, like it's worth it, or I wouldn't be like yo, you know what I mean.
CD: yeah, yeah, yeah for sure.

MARTIN: It doesn't come around that often.

9.      On January 25, 2023, at approximately 10:07 am, the CD, initiated a recorded

FaceTime call with MARTIN, using 561-459-9923. The CD and MARTIN arranged to meet

on Friday January 27, 2022, in Pompano Beach, Broward County, Southern District of

Florida, in order for MARTIN to procure, two firearms and an ounce of fentanyl for the CD.

MARTIN stated, "I would have to go get the blue stuff quick. Because it's, he's probably he's

6

probably on his last couple of ones. But it ain't gonna be 3 bands," indicating again a source for his fentanyl.

10.     On January 27, 2023, at the direction of SA Belga, the CD met with MARTIN in Boca Raton, Palm Beach County, Southern District of Florida.  At approximately 11:53 a.m., the CD called MARTIN.  MARTIN informed the CD several times that he needed to pick up the suspected fentanyl from an unknown person in Boynton Beach, Palm Beach County, Southern District of Florida.

11.     According to records provided by the Florida Turnpike Enterprise, MARTIN was captured on camera traveling southbound on the Florida Turnpike past the Boynton Beach Turnpike Plaza on January 27, 2023, at approximately 2:00 pm. The images obtained from the Florida Turnpike depict MARTIN operating the gray Dodge Durango bearing license plate: LHLC27 with a person, subsequently identified as JAMES CINE, the defendant in this case (hereinafter "defendant CINE"), in the vehicle's passenger seat.

12.     At approximately 2:12 pm, MARTIN arrived at the meeting location in Boca Raton, Palm Beach County, Florida, and met with the CD on the passenger side of the CD's vehicle.  This meeting was audio and video recorded. The CD informed MARTIN that his passenger (defendant CINE) could not enter his truck because he was unfamiliar with him. MARTIN handed the CD a quantity of suspected fentanyl wrapped in a plastic bag stating, "Please, please, I'm telling you, please be careful with that."  MARTIN subsequently stated as to the then-unknown male passenger in MARTIN's vehicle (defendant CINE), "that's my boy," and "he'll cook, he'll cook like half a brick (inaudible)." Defendant MARTIN departed from the meeting with defendant CINE at approximately 2:14 pm.  Subsequent DEA/SERL laboratory analysis of the substance purchased from MARTIN and CINE determined such

7

to be 11.0 net grams of Fentanyl.

13.     Following the meeting on January 27, 2023, another transaction was set up by the CD with MARTIN at direction of ATF for February 8, 2023, for the CD's purchase of a rifle and 1.5 ounces of "blue" fentanyl from MARTIN in return for $4,800.00. MARTIN informed the CD via text message that he could conduct the sale "tomorrow just let me know when you're on your way and i'll go get it."

14.     On February 8, 2023, at the direction of SA Belga, the CD met with MARTIN in Boca Raton, Palm Beach County, Southern District of Florida. This transaction was audio and video recorded. At approximately 1:32 pm, MARTIN arrived in a white sedan accompanied by defendant CINE in the passenger seat, and proceeded to enter the CD's vehicle. Following his entry, MARTIN immediately provided the CD a blue plastic bag with 18.4 net grams of fentanyl based on subsequent DEA/SERL laboratory analysis. The CD handed MARTIN $4,800.00 in ATF Investigative Funds to purchase the fentanyl.

15.     On February 16, 2023, in a recorded communication, MARTIN agreed to meet the CD the following day in the vicinity of the Florida Turnpike and Lake Worth Road area to sell the CD a Glock 19 pistol and 2 ounces of fentanyl.

16.     At approximately 1:25 pm on February 17, 2023, MARTIN, accompanied by defendant CINE in the passenger seat of MARTIN's vehicle, arrived in a public parking lot located at 8205 Lake Worth Road, Lake Worth, Palm Beach County, Southern District of Florida. This transaction was audio and video recorded. MARTIN met the CD in the rear of the vehicle the CD was driving, at which time the CD purchased a Glock Model 19 Gen 4, 9mm caliber semi-automatic pistol, SN: BKUW567, and two ounces of fentanyl marked "Blue Sherbert" for in return for $5,500 in ATF investigative funds.

8

17.     Once the CD completed the initial transaction for the Glock and 22.31 net grams of fentanyl based on DEA/SERL analysis, the CD asked defendant MARTIN if he could purchase an additional $500.00 worth of fentanyl. MARTIN then walked towards the front passenger side of his Chevrolet Malibu and retrieved more fentanyl from the area in which CINE was seated.  MARTIN then returned to the rear of the CD's vehicle, and a second transaction for 3.68 net grams of fentanyl (based on subsequent DEA/SERL analysis) in return for $500.00 in ATF investigative funds ensued. Based upon the DEA/SERL laboratory analysis, the total amount of confirmed fentanyl purchased from defendants MARTIN and CINE on February 17, 2023, was 25.99 net grams of a mixture and substance containing fentanyl.

18.     Following the video-recorded transaction, the CD walked away from the rear of the vehicle, and ATF agents initiated a takedown of MARTIN and defendant CINE. MARTIN and CINE were both transported to the ATF West Palm Beach Office.  In audio and video recorded interviews, SA Belga separately read defendant MARTIN and defendant CINE their constitutional *Miranda* warnings from a *Miranda* rights card after which MARTIN and CINE verbally acknowledged that they understood his rights and agreed to speak with SA Belga and ATF TFO Richard Silva.

19.     Post-*Miranda* defendant MARTIN stated he sold the CD narcotics on four occasions, and firearms on three occasions.  TFO Silva asked MARTIN if he had ever sold James CINE, a/k/a "Kobe," any firearms?  MARTIN advised that in January 2023, he traded CINE a Taurus, Model G2C, 9mm pistol, and a Smith &Wesson, Model Lady Smith revolver in return for heroin.  Defendant MARTIN stated he also purchased a Sig Sauer pistol for $200.00 from Kobe, but that Kobe bought the pistol back from him a short time later.

9

MARTIN would testify that that CINE acted as his source of supply for the drugs he (MARTIN) sold to the CD, and that CINE had accompanied him on three of the above-described drug sales to the CD.  MARTIN further stated that CINE provided him the Glock Model 19 gen 4 he sold the CD earlier that day (February 17, 2023).  SA Belga would corroborate defendant MARTIN's claim that CINE supplied the Glock Model 19 Gen 4 pistol on February 17, 2023, for sale to the CD by a text message recovered from defendant CINE's phone via consent from defendant CINE, wherein defendant MARTIN requests defendant CINE to bring the Glock 19 for sale to the CD in addition to the drugs. Defendant MARTIN also provided ATF consent to search his (defendant MARTIN's) phone.

20.     Post-*Miranda*, defendant CINE admitted he had handled the Glock 19 gen 4 pistol which was sold to the CD on February 17, 2023, as well as the firearm MARTIN sold the CD on January 27, 2023 (Sig Sauer, Model P365-XMacro, 9mm, semi-automatic pistol, bearing serial number: 66FF390325), and further admitted that his DNA would be found on both pistols. Defendant CINE voluntarily consented to provide a DNA sample for investigatory purposes, signing an ATF consent to search form. Voluntary consent by defendant CINE was given for his cellular phone, which yielded the aforementioned text communications between himself and MARTIN. Defendant CINE claimed that he and MARTIN purchased drugs from the same source of supply in Lake Worth, Palm Beach County, who he identified as "Chico."  Defendant CINE further advised in his recorded

10

statement that he was to receive a percentage of the proceeds of MARTIN's drug sales (a "stack" or $1,000 per deal) to the CD.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

BY: _____
JOHN C. McMILLAN
ASSISTANT UNITED STATES ATTORNEY

SEEN, AGREED AND APPROVED:

_____
JAMES CINE
DEFENDANT

_____
SCOTT SKIER, ESQ.
ATTORNEY FOR DEFENDANT

Dated: ___11/2/23_____
At West Palm Beach, Florida.

11